IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHAKUR W. STEWART, | § § § § | |
| Plaintiff, | | |
| v. | § § § § § § § | Civil Action No. 3:20-cv-00497-M |
| JOHN COUGHLIN, et al., | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Joint Motion for Summary Judgment (ECF No. 60), filed by Defendants John Coughlin and the City of Dallas. Also pending is Plaintiff's Unopposed Motion for Leave to File Supplemental Appendix. ECF No. 83. The Unopposed Motion for Leave is **GRANTED.**

On August 16, 2022, the Court heard argument on the Motion for Summary Judgment. During the hearing, for the reasons stated on the record, the Court granted summary judgment on Plaintiff's claims relating to suppression of evidence relating to cab driver Simon Gemda, and took the remainder of the Motion for Summary Judgment under advisement. For the reasons stated below, the remainder of the Motion for Summary Judgment is **DENIED.**

### I. Factual Background

Michelle Chin was shot and killed in South Dallas on August 13, 1987. Defendant John Coughlin was the detective assigned to the case. In 1988, Plaintiff Shakur Stewart, formerly known as Everold W. Stewart, was prosecuted and convicted of her murder. Plaintiff was convicted based primarily on the testimony of two witnesses: Simon Gemda and Leroy Davidson, the victim's companion. Gemda testified that he drove Davidson and the victim in his

cab to the apartment complex where she was shot, that he was at that location when the shooting occurred, and that he had seen Plaintiff running nearby, holding a gun. Davidson testified that he was with the victim outside the apartment complex when two groups of people began shooting at each other and the victim was hit with a stray bullet and killed. Davidson testified that he saw the shooters and that Plaintiff shot the victim.

In 2018, Plaintiff successfully petitioned the Texas Court of Criminal Appeals for a writ of habeas corpus under *Brady v. Maryland*, 373 U.S. 83 (1963), on the grounds that Coughlin's handwritten notes of interviews with Gemda and Davidson contained impeachment material, which was not disclosed to the defense. Coughlin's notes state, in relevant part:

> Davidson stated that he didn't see the shooters but know [sic] they are Jamaicans from the voices he heard.
>
> . . .
>
> Davidson states he knows these Jamaicans by sight but not by name.
>
> . . .
>
> [Davidson] then went to section M [of the mug shot book] where he selected the photo of David Matthews . . . from M002 of book as the man he observed shoot the comp.
>
> Investigator Alexander interviewed West End cab driver Simon Abebe Gemda. Gemda stated that he was on Grand about two blocks away when he heard five or six shots. He drove to the scene and saw Davidson and another unk b/m coming from the telephone across from the offense location.

D. App. (ECF No. 61-1) at 64–69.

In support of Plaintiff's habeas petition, the prosecuting attorney, Robert Dark, and Plaintiff's trial counsel both submitted affidavits stating that they did not receive Coughlin's notes at or before trial, and had no knowledge of the witnesses' statements contained within them, which conflicted with the witnesses' trial testimony. Dark's affidavit stated: "I did not receive a copy of these notes and did not see them when I was involved in this case. I was also

2

not aware and was never told that these two State's witnesses had made these statements to the police investigator." Sec. Am. Compl. (ECF No. 36) ¶ 23. The State agreed that Plaintiff was entitled to relief under *Brady*. D. App. at 91.

The stipulated findings of facts adopted by the Texas Court of Criminal Appeals summarized the relevance of the interview notes as relating to Gemda's and Davidson's trial testimony:

> Mr. Davidson identified [Plaintiff] as the shooter during his trial testimony, but the Notes indicated that he either did not see the shooter or identified Mr. Matthews as the shooter.
>
> Mr. Davidson testified that he and Ms. Chin traveled to the apartments at the location of the shooting to visit a friend, but the Notes indicated that they went to the apartments regarding the arrest of Ms. Chin's brother-in-law.
>
> Mr. Davidson testified that he saw [Plaintiff] fire three shots prior to Ms. Chin falling to the ground, but the Notes indicate that he identified Mr. Matthews as the shooter.
>
> Mr. Gemda testified that he was at the location of the shooting and witnessed it occurring, but the Notes indicate that he told police he was two blocks away when he heard gunshots.
>
> Although Mr. Gemda testified at trial that he had not told police the truth when he was first interviewed, the specific facts of what he told the police on the night of the shooting was not revealed to trial counsel or the jury.

D. App. at 99–100.

Plaintiff's conviction was set aside, and the state district court dismissed the prosecution on September 16, 2019.

On February 26, 2020, Plaintiff filed this case under 42 U.S.C. § 1983, asserting two claims: (1) a claim against Coughlin for violating Plaintiff's Fourteenth Amendment due process rights by suppressing favorable evidence, in violation of *Brady*; and (2) a claim against the City of Dallas for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), alleging that the City failed to train its officers on *Brady* and did not institute policies

3

to ensure all exculpatory evidence was turned over to the district attorney's office. Defendants move for summary judgment.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*., 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial*."* *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Little*, 37 F.3d at 1075. However, the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

**III.     Analysis**

Defendants move for summary judgment on the grounds that Coughlin is entitled to qualified immunity and that there is no evidence in support of Plaintiff's *Monell* claim for municipal liability against the City. For the reasons stated on the record at the summary judgment hearing, the Court previously granted Defendants' Motion for Summary Judgment as to the statements in Coughlin's notes relating to Gemda; accordingly, only the information in Coughlin's notes relating to Davidson remain actionable as the grounds for Plaintiff's Fourteenth Amendment and *Monell* claims.

   **a.  Qualified Immunity**

As a general rule, government officials performing discretionary functions are entitled to qualified immunity. *Morris v. Dearborne*, 181 F.3d 657, 665 (5th Cir. 1999). Once qualified immunity is asserted, the Plaintiff carries the burden to establish facts to show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc).

Defendants move solely under the first prong of the qualified immunity test. Defendants acknowledged at the summary judgment hearing that the statements in Coughlin's notes relating to Davidson qualify as *Brady* material, but argue that Plaintiff cannot show a violation of Plaintiff's constitutional rights to due process, because Plaintiff cannot show that Coughlin deliberately or intentionally suppressed his handwritten notes.

As an initial matter, the parties appear to dispute the state of mind that Plaintiff must establish to survive summary judgment. A criminal defendant can establish a *Brady* violation by showing that evidence was inadvertently suppressed. *See Strickler v. Greene*, 527 U.S. 263, 288,

(1999). Defendants argue that the standard is different in the civil context, and point to several non-*Brady* Supreme Court cases that they maintain stand for the proposition that § 1983 applies only to deliberate decisions of government officials to violate someone's constitutional rights. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (noting, in a § 1983 case seeking to impose liability against a police department for the death of a passenger during a high speed police chase, that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"); *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property."). In particular, Defendants point to *Daniels*, in which the Supreme Court held that the Due Process Clause is not implicated by "mere lack of due care by a state official." 474 U.S. at 330–31. In response, Plaintiff points to cases distinguishing the applicability of *Daniels* in the *Brady* context, and argues that even if all § 1983 violations require more than merely negligent conduct, there is a fact question as to whether Coughlin was at least recklessly indifferent in failing to disclose the information regarding Davidson reflected in his handwritten notes.

      The Court has found no case in which the Supreme Court or Fifth Circuit has expressly discussed the minimum state of mind necessary to impose *Brady* liability in the § 1983 context; instead, the Fifth Circuit appears to have only observed that deliberate concealment precludes the assertion of qualified immunity. *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) ("[A] police officer cannot avail himself of a qualified immunity defense if he . . . conceals exculpatory evidence, for such activity violates clearly established constitutional principles."). The Eleventh and Eighth Circuits have concluded that intentional conduct is required. *See Porter v. White*, 483 F.3d 1294, 1309 (11th Cir. 2007) (granting summary judgment for officer

6

where there was no evidence that the officer "intentionally withheld the Hendrickson report from the prosecution"); *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) ("*Brady* ensures that the defendant will obtain relief from a conviction tainted by the State's nondisclosure of materially favorable evidence, regardless of fault, but the recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial."). In contrast, the Sixth Circuit has stated that a § 1983 plaintiff need not show intentional or bad faith conduct when the exculpatory value of a piece of evidence is "apparent." *Moldowan v. City of Warren*, 578 F.3d 351, 388 (6th Cir. 2009). Similarly, the Ninth Circuit has held that a § 1983 plaintiff need only show that police officers acted with deliberate indifference to, or reckless disregard for, an accused's rights or the truth in withholding evidence from prosecutors. *Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1087–88 (9th Cir. 2009).

  The Court concludes that, at summary judgment, it need not resolve the minimum culpability necessary to impose *Brady* liability in the § 1983 context, because a reasonable factfinder could find that Coughlin failed to disclose the information about Davidson's prior statements contained in his handwritten notes to the prosecutor—and, by extension, the defense—either intentionally, or with deliberate indifference or reckless disregard.

  Coughlin testified at his deposition that he was the investigating officer assigned to the criminal case involving Plaintiff, and that it was the practice of the Dallas Police Department to keep a single investigative file related to a particular homicide investigation. D. App. (ECF No. 61) at 416–18. He further testified that when he was a homicide detective between 1982 and 1990, it was his practice to "turn over all of the information to the DA's office and the DA on the case, and it was their responsibility to do whatever they did with it." *Id*. at 442. He testified: "I

7

turned over all the information. I never withheld anything. . . . So, yeah, I mean, whether *Brady* was there or not, it really didn't matter to me. Here's my file. Do with it as you see fit." *Id.* at 442–43.

Coughlin testified that, if a case were going to trial, "the process would be the DA that gets assigned to the case would call you and ask you to bring your murder folder." *Id.* at 429. He further testified that "[d]epending on who the DA was, some would make a full copy of it; some would review it and take what they wanted; some would review it and make notes." *Id.* However, Coughlin testified that, based on his custom, he is "sure" he met with Robert Dark, the prosecuting attorney, but Coughlin "[does not] recall actually ever meeting with him."[1] *Id.* at 436. In addition, Coughlin testified he cannot remember whether he delivered the file to Dark, or Dark's specific practices about copying an investigative file. *Id.* at 429–30, 432. Coughlin could not remember a face-to-face meeting or having the file sent from the Dallas Police Department to the DA's office. *Id.* at 430–31. Coughlin testified that he could only "assume" that his handwritten notes were in the file if and when it was provided to the prosecutor. *Id.* at 432. When asked whether information about Davidson's prior statements, reflected in Coughlin's notes, qualified as *Brady* material, Coughlin agreed that it was "something that should be brought up so the defense can look at that," and if the prosecutor knew about it, "he should have cued them in." *Id.* at 452–53.

Dark testified during his deposition that, prior to Plaintiff's criminal trial, he never learned of Davidson's statements, either by reading Coughlin's handwritten notes or being told

---

[1] The Court notes that although Coughlin testified at his deposition in September 2020 that he could not recall actually meeting with Dark, Coughlin's July 1, 2022, declaration filed in support of Defendant's Motion for Summary Judgment states "I recall meeting at least once with Assistant District Attorney Robert Dark about the Chin murder investigation." D. App. 464. Accordingly, at minimum, there appears to be a fact issue as to whether Coughlin remembers meeting with Dark.

8

about them, and that if he had, he would have moved to dismiss the case because Davidson's inconsistent statements "were so blatantly exculpatory." P. App. (ECF No. 74-1) at 12–14. Dark testified that he does not remember his interview with Coughlin in connection with Plaintiff's case, but testified that he had "a pretty standard routine," which he did not veer from, to prepare a case for trial. D. Supp. App. (ECF No. 78-1) at 6–7, 14. This routine involved having the officer come down to the courthouse to meet face-to-face with Dark to go over the officer's testimony; Dark testified that, during that meeting, he would ask the officer questions about the case and take detailed notes as they talked. *Id.* at 6–7. After they finished the interview, Dark would then check with the officer "to see if he had any reports or documents that I didn't have in my file," such as physical evidence or autopsy reports. *Id.* at 8–9. As to his routine regarding *Brady* material, Dark testified to the following:

> Well, after doing the interview and taking detailed notes, copying any documents, the last thing I would ask the detective is, Do you have any *Brady* material, anything that's mitigating as to guilt of the defendant, anything favorable, anything that went to the credibility of any witness, do you have any of that?
>
> If he said no, I would take him at his word. If he said yes, I would -- if it was in writing, I would take it, make a copy of it, and tender a copy to the defense attorney. And then at pretrial, when we made -- when we -- when we would go through the motions, I would announce in court that I have tendered to the defense attorney *Brady* material provided by a detective in the case, and they would acknowledge it.

P. App. at 4–5.

Dark further testified that he "would always ask about *Brady* at the tail end of the interview . . . because [he] thought that was a very important part of the interview that [he] didn't want to confuse with the rest of the case." *Id.* at 9. He also stated that he asked about *Brady* material in this manner as part of his habit and routine in every murder case he prepared for trial, and did not ever veer from this routine in any case that he is aware of. *Id.* at 10. Dark also testified that he would "never ask the detective to just give his file to me for me to go through,"

9

and that he believed Coughlin's suggestion that Coughlin provided the entire investigative file to Dark to be "totally ridiculous." D. Supp. App. at 9; *see also id.* at 11 ("I don't know of anybody that would conduct an interview of a detective in that fashion, by just taking the detective's file and rummaging through it, hopefully finding important evidence.").

Accordingly, the Court finds there is a fact question as to whether, in accordance with his standard practice of interviewing the investigating officer prior to a murder trial, Dark asked Coughlin whether he had any *Brady* or potentially exculpatory or impeachment material, and Coughlin answered in the negative. In light of Coughlin's testimony that *Brady* evidence "didn't really matter" to him, a reasonable jury could find that Coughlin was at least deliberately indifferent or reckless as to his obligation to disclose *Brady* evidence, including the exculpatory evidence that Davidson had provided an inconsistent statement to police officers and had initially identified someone other than Plaintiff as the shooter.

In addition, Plaintiff points to other evidence in the record from which a reasonable factfinder could find that Coughlin knowingly included only the version of Davidson's story that was testified to at trial. Coughlin's notes indicated that, on the night of the shooting, Davidson told police he did not see the shooters, and that Davidson later "selected the photo of David Matthews . . . as the man he observed shoot the comp[lainant]." D. App. at 64–69. However, other documents in the investigative file reflect different facts. For example, a Prosecution Report, which Coughlin testified that he wrote, states that Davidson would be able to testify that he "saw three suspects shooting" and "positively identified the suspect from a photo lineup as one of the three suspects he saw shooting," which omits both that Davidson first told police he did not see the shooters and that he previously identified Matthews as the single shooter. *See* D. App. at 115; *see also id.* at 440 (Coughlin agreeing that in "[his] Prosecution Report [he] made

10

no reference at all to the fact that [Davidson] initially said he did not see who – who shot the complainant").

During his deposition, Coughlin explained that it "wasn't unusual" for someone to "say something and then later change their story," because "people start[] out not wanting to tell you" and "have to decide what side they're going to be on one way or the other." P. App. at 66. He agreed that he believed Davidson "said one version of events to the police the first time, and then he later changed his mind and went to the truth in subsequent conversations," and "came around . . . to what he actually saw." *Id.* at 66–67. When asked if, in these circumstances, he was simply choosing which version of the truth he wanted to go with, Coughlin testified: "I went with what I felt was what he saw once he chose his – chose his way." D. App. at 441.

The Court finds that Coughlin's testimony creates a genuine issue of material fact as to whether Coughlin's failure to include Davidson's prior inconsistent statements in other documents, such as the Prosecution Report, was a knowing suppression of potentially exculpatory or impeachment evidence. *See Youngblood v. W. Virginia*, 547 U.S. 867, 869–70 (2006) ("*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995))); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) ("[P]laintiff has come forward with evidence which, if credited by the fact-finder, would establish that the defendant knowingly and willfully ignored substantial exculpatory evidence. A fact-finder reasonably could conclude that Lt. McCoy deliberately looked the other way in the face of exonerative evidence . . . . Lt. McCoy's deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983.").

Accordingly, as there exist triable issues of fact as to whether Coughlin violated Plaintiff's constitutional rights by not disclosing the information contained in Coughlin's handwritten notes pertaining to Davidson, summary judgment on qualified immunity grounds is inappropriate.

### b. Municipal Liability

Defendants seek summary judgment on Plaintiff's claim for municipal liability against the City of Dallas under *Monell*. Plaintiff alleges the City of Dallas caused the *Brady* constitutional violation he suffered "because it completely failed to either train its officers regarding their duties under *Brady*" or to "institute any policies to ensure that all exculpatory evidence was delivered to the district attorney's office and copied, so that it could be produced to criminal defendants." 2d Am. Compl. ¶¶ 4, 66–75.

*Monell* provides that a municipality can be liable under § 1983 when the violation of the plaintiff's federal rights is attributable to a municipal policy or practice. 436 U.S. at 691. To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017).

Regarding the first *Monell* element, Defendants contend summary judgment is appropriate on the grounds that Stewart cannot point to any evidence to support his claim that the City had no policy requiring disclosure of *Brady* evidence or that the City failed to properly train its officers. An "official policy" can take the form of (1) a formal policy, ordinance, or regulation officially adopted by the municipality's lawmaking officers, or (2) a "persistent, widespread practice" which although not officially adopted, "is so common and well settled as to

12

constitute a custom that fairly represents municipal policy." *Burge v. St. Tammany Par.*, 336 F.3d 363, 369 (5th Cir. 2003).

Plaintiff argues that Defendants provide no written policies or other contemporaneous evidence of *Brady*-related policies or training applicable to Dallas police officers. Instead, Defendants rely on three almost identical declarations submitted by Coughlin and his partner, Robert Alexander, and supervisor, Pat Herring, describing a purported "open-file policy," under which "homicide detectives were required by DPD policy to provide all of the materials associated with an investigation (i.e. the entire investigation file) to prosecutors at the outset of any associated criminal case." D. App. at 455, 458, 462. The declarations each recite that "the detectives and supervisors understood the requirements of the policy and the importance of following it," and "[a]ll of the detectives and supervisors supported and scrupulously followed the policy; this universal 'buy in' further emphasized its importance and created an atmosphere of positive peer pressure in which detectives viewed full disclosure as a matter of honor and fairness." D. App. at 455, 457–58, 462–63.

Under Fifth Circuit precedent, the informal open-file policy could potentially qualify as an official policy if it was persistent, widespread, common, and well-settled among police officers. *See Burge*, 336 F.3d at 369. However, the Court finds that Plaintiff has shown a fact question as to whether the "open-file policy" described by Officers Coughlin, Alexander, and Herring in their declarations was, in fact, an official policy of the Dallas Police Department, and more importantly, whether the open-file policy is a policy requiring disclosure of *Brady* evidence.

Plaintiff challenges the declarations as flawed and not constituting proper summary judgment evidence, because they include statements outside of the declarant's personal

13

knowledge. Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). At the summary judgment stage, evidence relied upon need not be presented in admissible form, but it must be "capable of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)). Neither legal conclusions nor statements made without personal knowledge are capable of being so presented. *See* Fed. R. Evid. 602, 701, 702.

The objected-to statements in the officers' declarations—namely, those purporting to opine on what "all" detectives understood and whether they all "scrupulously" followed the policy—are outside of the detectives' personal knowledge and are not competent summary judgment evidence. Accordingly, there is a fact question as to whether the open-file policy was widespread, common, and well-settled during the time period in question.

In addition, even if it were undisputed, the open-file policy is not dispositive of Plaintiff's claim that the City failed to institute any policies requiring delivery of exculpatory or impeachment evidence under *Brady*. At best, the open-file policy is described as a policy by which the "entire investigative file" in the custody of the Dallas Police Department was made available to prosecutors. *See* D. App. at 462. However, both deposition testimony and the declarations of the police officers indicate that there may be materials relating to a criminal investigation that are not necessarily kept in the Dallas Police Department criminal file. *See, e.g.*, *id.* ("[D]etectives were required to keep all investigation-related materials in DPD's custody related to a particular homicide (including any handwritten notes) in a single file stored in the

14

CAPERS office, *with the exceptions of evidence* that had been (1) inventoried and stored in DPD's secured evidence storage facility; (2) sent to an outside agency for forensic testing or examination; or (3) provided to and retained by prosecutors." (emphasis added)); *id.* at 425 (Coughlin agreeing at deposition that the trial transcript referenced a "photo lineup," but he "did not see" evidence of a photo lineup in the file).

More importantly, *Brady* does not limit exculpatory evidence to that which is reduced to writing and stored in an investigative file. *E.g.*, P. App. at 4–5 (Dark's routine for disclosing *Brady* material included making a physical copy for defense counsel "if it was in writing"). Hypothetically, if Coughlin only remembered that Davidson had made prior inconsistent statements to police officers, as opposed to memorializing it in writing, *Brady* would be violated if that impeachment evidence was intentionally withheld. *See Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008) ("[a] police officer's deliberate concealment of exculpatory evidence violates" a defendant's right to a fair trial under *Brady*). However, in this hypothetical, because the evidence was not stored in writing in the file, the open-file policy would not require disclosure of that *Brady* material to the prosecutor for production to the defense. Put differently, simply making sure that the investigative file is made available to prosecutors does not necessarily ensure that all potentially exculpatory or impeachment evidence will be disclosed to the defense, and thus, Defendants have not shown the absence of a fact question as to whether the City of Dallas failed to institute any policies to ensure that all exculpatory evidence was delivered to the district attorney's office, so that it could be produced to criminal defendants.

Summary judgment is likewise inappropriate on Plaintiff's failure to train theory. The failure to train municipal employees also may constitute a policy when it "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Thus, although municipalities are not normally liable for inadequate training of employees, failure to properly train is an actionable policy under § 1983 if, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Deliberate indifference can be shown two ways: (1) the constitutional violations occur "so often" that the factfinder can infer from the pattern that the need for further training must have been plainly obvious, *id.* at 390 n.10, or (2) the "single-incident exception" applies, where even absent proof of pattern, deliberate indifference can be inferred if the risk of constitutional violations was or should have been an obvious or highly predictable consequence of the alleged training inadequacy.

Defendants argue that Plaintiff cannot prove a pattern of *Brady* violations or that the single-incident exception applies. The Court disagrees as to the single-incident exception, and finds that, based on the summary judgment record, a reasonable factfinder could determine that the risk of constitutional violations was or should have been an "obvious" or "highly predictable consequence" of the alleged training inadequacy, and thus infer deliberate indifference under the single-incident exception. *See Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018). In sum, there is a fact question as to whether the City of Dallas or Dallas Police Department "fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Id.* at 624–25.

A police officer's willful failure to disclose exculpatory evidence to the prosecuting attorney's office constitutes a constitutional violation under *Brady*. *See Sanders*, 950 F.2d at 1162; *Burge v. Par. of St. Tammany*, 187 F.3d 452, 480 n.11 (5th Cir. 1999) (noting that in 1967,

16

the Fifth Circuit declared "that suborning perjury and concealing exculpatory evidence by police officers were constitutional violations. *See Luna v. Beto*, 391 F.2d 329, 332 (5th Cir. 1967)"). The constitutional duty to disclose *Brady* material arises in every criminal prosecution; indeed, Dark testified that he specifically asked about *Brady* material at the end of every interview he conducted with police officers. *See* P. App. at 4–5, 9. The Supreme Court has recognized that "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force," *Connick v. Thompson*, 563 U.S. 51, 64 (2011), and the same is true here, regarding a police officer's disclosure obligations under *Brady*; "[u]nder those circumstances there is an obvious need for some form of training." *Id.*

There is a factual dispute as to whether Dallas police officers received training regarding their obligations under *Brady*. Defendants submit declarations describing the training detectives received regarding the purported open-file policy, but as discussed, that policy is not coterminous with an officers' legal duty under *Brady*. When asked during his deposition his understanding of a police officer's obligation under *Brady*, Coughlin responded, "[w]ell, I know in 1987, we had none." D. App. at 441. Moreover, when asked whether he knew of any policy within the Dallas Policy Department during the time he was in homicide about how officers were to handle *Brady* material, Coughlin responded "No, not really," and said that he did not think or does not remember any policies, written or otherwise, regarding *Brady* in the 1980s. *Id.* at 445–46; *see also id.* at 447 ("Back in the day, I don't know if there was a law. Like I said, I don't think *Brady* hit the police department until the '90s, in the '90s."). Similarly, when Coughlin was asked at deposition whether he understood that certain information favorable to the defense was required by law to be included in materials given to prosecutors, he responded "[b]ack in the day, I don't know if there was a law." *Id.* at 446–47.

Thus, a reasonable factfinder could infer that Coughlin, at least, was not sufficiently trained on the importance of identifying and disclosing exculpatory and impeachment evidence—and not just making available the investigate file as a whole—to prosecutors. *See Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) (noting it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information" under *Brady*), *abrogated on other grounds by Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017). Indeed, Coughlin's seemingly blasé approach to the obligation to disclose *Brady* evidence—*i.e.*, that it "didn't really matter" to him—suggests that constitutional violations would be an obvious or highly predictable consequence of that training inadequacy, particularly given that as a detective, he would frequently be the recipient of potentially exculpatory *Brady* evidence or impeachment material. *See id.* at 442–43.

"The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). Accordingly, there is a fact question as to whether the relevant policymakers—here, alleged to be the City Council or the Chief of Police—were deliberately indifferent to the failure to train police officers, such as Coughlin, on their obligations under *Brady*. *See Martinez v. Rojo*, No. 1:17-CV-00102-BU, 2020 WL 2542612, at *23 (N.D. Tex. May 19, 2020) ("Courts have consistently found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under § 1983.").

18

Defendants also argue that, under the third *Monell* element, Plaintiff has no evidence that the City's alleged lack of *Brady* policies or training were the moving force for the constitutional violation. To prevail on a *Monell* claim, the municipality's policy must be the "moving force" behind the constitutional violation. *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018). This requires a showing of direct causation, *i.e.* that there was "a direct causal link" between the policy and the violation. *Id.* Plaintiff must also demonstrate that the policy was implemented with "deliberate indifference" to the "known or obvious consequences" that constitutional violations would result. *Id.*

Here, as stated, the Court has already concluded a reasonable factfinder could find that the lack of adequate training or a clear policy regarding an officer's *Brady* obligations was implemented with deliberate indifference to the predictable or obvious consequences that *Brady* violations would result. The Supreme Court has recognized that such a finding "may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Brown*, 520 U.S. at 409–10. Accordingly, summary judgment is inappropriate on this ground as well.

## IV.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** as to the information in Coughlin's notes relating to Davidson. This case will be reset for trial. By **January 23, 2023,** the parties shall submit a joint report that includes an estimated length of trial and at least three proposed trial dates that accommodate all parties.

**SO ORDERED**.

January 6, 2023.

*[Signature]*
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE

19